Kingo KAWAOKA; Tatsumi Kawaoka, Plaintiffs–Appellants,

v.

The CITY OF ARROYO GRANDE; The City Council of Arroyo Grande; Mark M. Millis; B'Ann Smith; Gene Moots; A.K. Dougall; Doris Olsen, Defendants–Appellees.

No. 92–55714.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1993.

Decided March 2, 1994.

John B. Murdock, Santa Monica, California, for the plaintiffs-appellants.

Katherine E. Stone, Myers, Widders & Gibson, Ventura, California, for the defendants-appellees.

Craig Labadie, Robert N. Katz, McDonough, Holland & Allen, Oakland, California, for the amicus.

Before: .FLETCHER, PREGERSON and HALL, Circuit Judges.

FLETCHER, Circuit Judge:

Kingo and Tatsumi Kawaoka appeal the district court's grant of summary judgment for the City of Arroyo Grande (the "City") on the Kawaokas' claims that the City's general plan and temporary water moratorium deny the Kawaokas substantive due process and equal protection. We affirm.

## BACKGROUND

Since 1954, the Kawaokas have owned thirty-five acres of land within the City of Arroyo Grande. Until recently, the Kawaokas have used their property primarily for strawberry farming. Adjacent to and in close proximity to the Kawaokas' property are twenty additional acres of agricultural land owned by three separate parties, part of which has also been used for strawberry farming. The land surrounding these fifty-five acres is currently used for residential and commercial purposes. Recently, strawberry farming on the Kawaokas' property has become economically non-viable, in part because of the incompatibility of pesticide use with residential uses in this primarily residential area.

In 1988, the City began to update its general plan, a comprehensive land-use plan for the physical development of the City required by state law. Cal.Gov't Code §§ 65300–65361 (West Supp.1993). After numerous workshops, the City prepared a draft revised general plan. A primary goal of the general plan was to preserve the traditional rural atmosphere of the area. In the draft

revised general plan, with respect to the fifty-five acres belonging to the Kawaokas and the other three landowners in question, the City Council noted that while it wanted to preserve the land for agricultural use, it was concerned that such use might not be economically viable in the future. The City therefore designated the fifty-five acres for agricultural use, but also added Land Use Element Policy ("LUE") 1.5, which states that upon a showing that an agricultural use is no longer viable, the land could be converted to commercial and residential· uses.

LUE 1.5 also requires that a specific plan be prepared prior to the land's conversion to residential use.[1] A specific plan is a tool that implements a general plan in one of three ways: (1) by acting as a policy statement that refines the general plan's policies with respect to a specific area; (2) by directly regulating land use; or (3) by combining detailed policies and regulations into a focused scheme for development. *See* Governor's Office of Planning & Research, *Specific Plans in the Golden State*, at 7 (1989). Specific plans must include information regarding the distribution, location, and uses of land within the plan area; the distribution of transportation, sewage, water, drainage, solid waste disposal and energy facilities; standards for developing the land; and a program for implementing development of the land. Cal.Gov't Code § 65451 (West Supp. 1994). The specific plan must be consistent with the general plan. Cal.Gov't Code § 65454 (West Supp.1994).

In April and May, 1990, the City Council held hearings to review the draft revised general plan. The Kawaokas retained a consultant, Burtram Johnson, to appear at several meetings on their behalf. Johnson argued that the Kawaokas' property should be designated for residential use rather than agricultural use and objected to the specific plan requirement.

In response to the Kawaokas' requests, the City Council changed the land use designation of the fifty-five acres. The Kawaokas' property was divided into two parcels: the northern parcel was designated single family ("SF") use, subject to 4.5 maximum units per acre; the southern portion was designated rural residential ("RR") use, with 1.0 maximum units per acre. According to Lloyd Zola, a planning consultant hired by the City to update several elements of its general plan, these densities were recommended in part because the City believed it faced long-term water availability problems. Overall density reductions throughout the City were recommended as one way to address the anticipated water shortage. Zola also recommended this combination of densities as a compromise between the density of surrounding lands and the density that the Planning Commission had proposed to apply to existing non-prime agricultural lands. The specific plan requirement was maintained.[2]

On May 22, 1990, the City Council unanimously adopted the general plan update. On the same day, it adopted a forty-five day water moratorium imposing restrictions on some development applications in the City.

---

1. Land Use Element 1.5 states:

 At such time as they are no longer economically viable, permit the conversion of the existing strawberry fields located south of Grand Avenue near the western city limits to urban use subject to preparation of a specific plan as set forth in Government Code Sections 65450–65457 ...
 a. If converted, utilize the northerly portion of the property adjacent to Grand Avenue for commercially-related uses.
 b. If converted, utilize the southerly portion of the property for single family residential (less than 5.0 dwelling units per gross acre) and rural residential (less than 2.0 dwelling units per gross acre) uses.
 (CR 22, Exh. 2).

2. The Kawaokas argue that the City did not amend the agricultural designation at this time but instead maintained the requirement that the Kawaokas prove that agricultural use is not economically feasible before the land will be designated for residential use. It is true that the language of the general plan LUE 1.5 was not altered. However, the declarations of City Attorney Judy Skousen, Planning Consultant Lloyd Zola, and City Planning Director Doreen Liberto–Blanck all indicate that the City did accept the Kawaokas' request for a residential designation and that the City has informed the Kawaokas of their decision on multiple occasions. The minutes for the April 25, 1990 City Council meeting and the map that accompanies the general plan confirm that the City Council designated the land for residential use.

In enacting the moratorium, the City Council relied on reports indicating that the City's water supply was 3,492 acre feet per year as of May 1990. If the City granted all pending development applications, an annual supply of approximately 4,415–4,611 acre feet would be required. If conservation measures were implemented, the City would still have a shortfall of 637 to 833 acre feet per year. On June 26, 1990, the water moratorium was extended by ten months and fifteen days to run for a total of one year.

In 1988 or 1989, prior to the amendment to the general plan, the Kawaokas decided to sell their property. They received two offers for $6 million each, which were rescinded due either to water availability or density problems. At the time the general plan was adopted, the sale documents for the Kawaokas' property were in escrow to a third party, Lee Webb, who had also offered $6 million to purchase the property. Apparently, this offer was contingent on the property being designated for a minimum density of 5.0 residential units per acre. After the adoption of the general plan, Webb terminated the pending escrow and offered to purchase the property for $3,735,000 due to the lower density designations adopted by the plan. This second offer was retracted when Webb learned that a specific plan would be required prior to development. The second Webb offer may not have been mentioned to anyone in the Kawaoka family because they instructed their broker to reject any offer of less than $6 million.

At the time that the general plan amendment was adopted, the City did not have any regulations describing how a property owner could apply for a specific plan. The California Code does not require cities to adopt such regulations, but instead appears to envision that the local planning agency will prepare specific plans. See Cal.Gov't Code §§ 65450–65457 (West Supp.1994). Section 65456(b) of the California Government Code anticipates that individuals may request that a city adopt a specific plan and authorizes the city to require them to pay a deposit for the

estimated cost of preparing the plan. Moreover, state law describes the information that a specific plan must contain and the proper procedures by which the city should adopt the plan. Cal.Gov't Code §§ 65450–65457 (West Supp.1994).

In July 1990, the Kawaokas were advised that the City would adopt ordinances specifying how parties could apply for specific plans. They were informed that they could not apply for a specific plan until the ordinances containing the guidelines and applicable procedures were in place. On May 14, 1991, nine months after the Kawaokas filed this suit, the City adopted the ordinances containing the relevant regulations for applying for and adopting specific plans.

The Kawaokas filed suit in district court in August 1990. In December 1991, the City filed a motion for summary judgment and on April 30, 1992 the district court granted the City's motion. See Kawaoka v. City of Arroyo Grande, 796 F.Supp. 1320 (C.D.Cal. 1992). The Kawaokas timely appealed.

The district court had jurisdiction over the Kawaokas' facial challenges under 28 U.S.C. §§ 1332(a) & 1343(a)(3) and 42 U.S.C. § 1983. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

### I. "As Applied" Substantive Due Process Challenge

 The district court held that it did not have subject matter jurisdiction over the Kawaokas' "as applied" challenge to the City's water moratorium and general plan because these challenges were not ripe for review. The Kawaokas' "as applied" claim alleges that because the City had no specific procedures or fee schedules for applying for specific plans when the general plan was adopted, the specific plan requirement as applied to the Kawaokas' property is an arbitrary means by which the City is blocking development of the Kawaokas' land.[3] The

---

**3.** The essence of the Kawaokas' substantive due process claim is that the density designation, the specific plan requirement, and the water moratorium were arbitrary and irrational and in violation of the Constitution. Because the general plan imposes specific requirements on the Kawaokas' property and because it is in fact these requirements (i.e. the density designation and the

existence of subject matter jurisdiction is a question of law reviewed de novo. *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 554 (9th Cir.1992).

■ Ripeness requirements are relevant only to "as applied" challenges, and not to facial challenges. *Southern Pac. Transp. Co. v. Los Angeles,* 922 F.2d 498, 507 (9th Cir. 1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). The ripeness doctrine serves the purpose of avoiding premature adjudication of administrative actions. A constitutional challenge to land use regulations is ripe when a property owner or developer has received the planning commission's "'final, definitive position regarding how it will apply the regulations at issue to the particular land in question.'" *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 351, 106 S.Ct. 2561, 2567, 91 L.Ed.2d 285 (1986) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 191, 105 S.Ct. 3108, 3118, 87 L.Ed.2d 126 (1985)). We have held that *MacDonald* and *Williamson* require a final decision by the government agency that inflicts a concrete harm on the landowner. *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454 (9th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988). Typically, before a decision is final the landowner must have submitted one formal development plan and sought a variance from any regulations barring development in the proposed plan that have been denied. *Herrington v. County of Sonoma,* 857 F.2d 567, 569 (9th Cir.1988), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989); *Kinzli,* 818 F.2d at 1454–55.[4]

■ We have recognized a "futility exception" to the final decision requirement, under which "the resubmission of a development plan or the application for a variance from prohibitive regulations may be excused if those actions would be idle or futile." *Del Monte Dunes, Ltd. v. Monterey,* 920 F.2d 1496, 1501 (9th Cir.1990); *Herrington,* 857 F.2d at 570. However, this futility exception does not alter a party's obligation to file at least one meaningful development proposal. *Herrington,* 857 F.2d at 569.

In applying this doctrine to the present case, the district court ruled that because the Kawaokas never submitted any formal development plans or filed a specific plan application, their "as applied" challenges were unripe for review. *Kawaoka,* 796 F.Supp. at 1325. This ruling is correct. The Kawaokas cannot argue that the specific plan requirement imposes "unworkable restrictions on the property, such that it cannot be used and cannot be sold," when they have never applied for a specific plan that has been denied.

The Kawaokas challenge this ruling on several grounds, none of which are persuasive. First, they argue that applying for a specific plan was impossible or futile. Specifically, they contend that the City had no ordinance specifying how a specific plan would be adopted and that they were specifically informed in July of 1990 that they could not at that time apply for a specific plan. While this is true, in May 1991, the City adopted procedures for specific plan applications. Although this occurred after the Kawaokas filed their action in district court, it was a full year before the district court entered its order. It therefore was not impossible or futile for the Kawaokas in the interim to apply for a specific plan.[5]

---

specific plan requirement) that the Kawaokas challenge, it is difficult to distinguish between the Kawaokas' facial and "as applied" challenges in this case. For this reason, to the greatest extent possible we have characterized the Kawaokas' claims as facial challenges so that they may be analyzed on the merits.

4. The Kawaokas would not be required to meet the second requirement—application for variance—for their claim to be ripe. Under California law, the only way to avoid the specific plan requirement or to change the density designation is to amend the general plan; a variance is not a

legally viable option. *See* Cal.Gov't Code § 65906 (West 1983) (prohibiting variance for use not expressly authorized by the zoning regulation governing the land in question); *Herrington,* 857 F.2d at 569–70 (plaintiff not required to seek variance where only way to obtain approval of 32–lot proposal is through amendment of the general plan); *Hoehne v. County of San Benito,* 870 F.2d 529, 534–35 (9th Cir.1989) (variance is not available for exceptions to the general plan).

5. The Kawaokas cite *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), for the proposition that

Moreover, the district court properly concluded that this nine month delay is neither unreasonable nor excessive. We have stated that for a delay to be excessive, it must be substantial, "since the Supreme Court has held a claim to be unripe even where the application process covering a development project required approximately eight years." *Kinzli*, 818 F.2d at 1454 n. 5 (citing to *Williamson County*, 473 U.S. 172, 105 S.Ct. 3108). Moreover, in the context of takings cases, courts have held that a short term delay in the development or use of property is not unreasonable. *See Agins v. Tiburon*, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2517 n. 9, 65 L.Ed.2d 106 (1988) (stating that "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership' "); *Zilber v. Town of Moraga*, 692 F.Supp. 1195, 1206 (N.D.Cal.1988) (one and a half year moratorium is not a taking).

The Kawaokas cite to *Hoehne v. County of San Benito*, 870 F.2d 529, for the proposition that they are not required to seek a legislative amendment to undo that which has just been done by the legislature. In *Hoehne*, the plaintiffs, whose property was zoned to permit subdivision into twelve lots, applied to subdivide their land into four lots. After they were denied, they applied for a subdivision of three lots and were again denied. The City subsequently amended the general plan to permit only one lot on the plaintiffs' sixty-acre parcel. We held that the City had made a final decision with respect to the Hoehne's property such that the Hoehnes were not required to apply for a general plan amendment before they could file a suit. 870 F.2d at 535. *Hoehne* is unhelpful to the Kawaoka's claim because even in *Hoehne*, the appellants had applied to the City to develop their property and been rejected; in the present case, the Kawaokas have filed no

such application. *See Southern Pac. Transp. Co.*, 922 F.2d at 503.[6]

The Kawaokas also cite to *Sierra Lake Reserve v. City of Rocklin*, 938 F.2d 951, 957 (9th Cir.1991), *vacated*, —— U.S. ——, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992), *on remand*, 987 F.2d 662 (9th Cir.1993), for the proposition that the harm from a substantive due process claim occurs at the time of the government's action. They suggest that this eliminates the requirement that they apply for a specific plan. This argument confuses the ripeness requirement with the doctrine of exhaustion of remedies that was at issue in *Sierra Lake*. The language quoted by the Kawaokas explains that in contrast to individuals who bring claims for procedural due process violations based on random acts of agency officials, parties who bring substantive due process claims are not required to exhaust all state remedies prior to seeking adjudication in federal court. *Id.* This doctrine is distinct from the ripeness requirement, which requires that the plaintiff have a final agency decision and therefore a "concrete controversy" before bringing an action in federal court. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1407 (9th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *see also* David R. Mandelker et al., Federal Land Use Law § 2.05[4](h), at 2.58 & n. 106.

Because the Kawaokas' "as applied" challenges to the City's actions are unripe, the district court properly dismissed those claims for lack of subject matter jurisdiction.

## II. *Facial Substantive Due Process Challenge*

### A. *Standard of Review*

 The district court granted summary judgment for the City with respect to

---

the fact guidelines were adopted after they filed their suit did not place a burden on them to subsequently apply for a specific plan. To the contrary, the *Lucas* court stated that such a situation would preclude review if the state court had rested its judgment on ripeness grounds, *id.* at ——, 112 S.Ct. at 2891, as the district court did in this case. The Court considered *Lucas's* takings claims only because the state court had addressed the merits of these claims. *Id.*

6. If the Kawaokas' claim is that the specific plan requirement or the RR and SF zoning are unworkable restrictions that render their property unusable, they must first attempt to "use" their property by attempting to prepare a specific plan or to submit a development plan. However, a claim that the general plan's density designation and specific plan requirement are irrational is considered as part of the Kawaokas' facial challenge.

the Kawaokas' facial challenges. A grant of summary judgment is reviewed de novo. *Jones v. Union Pac. R. Co.*, 968 F.2d 937, 940 (9th Cir.1992); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 629 (9th Cir.1987). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992); *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

To establish a violation of substantive due process, the Kawaokas are required to prove that the City's general plan or temporary water moratorium was " 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.' " *Sinaloa Lake*, 882 F.2d at 1407 (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)). Legislative acts that do not impinge on fundamental rights or employ suspect classifications are presumed valid, and this presumption is overcome only by a "clear showing of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981); *see also Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462, 108 S.Ct. 2481, 2489, 101 L.Ed.2d 399 (1988); *Greenbriar, Ltd. v. Alabaster*, 881 F.2d 1570, 1577 n. 14 (11th Cir.1989).

In a substantive due process challenge, we do not require that the City's legislative acts actually advance its stated purposes, but instead look to whether " 'the governmental body *could* have had no legitimate reason for its decision.' " *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 690 (9th Cir.1993) (citing *Shelton v. City of College Station*, 780 F.2d 475, 483 (5th Cir.) (en banc), *cert. denied*, 477 U.S. 905 [106 S.Ct. 3276, 91 L.Ed.2d 566] (1986) (emphasis in original)). The City's general plan does not

violate substantive due process as long as it advances any legitimate public purpose, *Construction Indus. Ass'n v. Petaluma*, 522 F.2d 897, 906 (9th Cir.1975), and if it is " 'at least fairly debatable' " that the decision to adopt the general plan and the water moratorium was rationally related to legitimate governmental interests, the City's actions must be upheld. *Christensen v. Yolo County Bd. of Supervisors*, 995 F.2d 161, 165 (9th Cir.1993) (citations omitted).

Two aspects of the general plan are alleged by the Kawaokas to be irrational and arbitrary: the requirement of a specific plan and the density designation. The Kawaokas also challenge the City's temporary water moratorium.

### B. Specific Plan Requirement

The Kawaokas argue that the specific plan requirement is arbitrary and is merely a tool used by the City to prevent development of their land. They argue that the City's reasons for requiring a specific plan are pretextual.

The record supports the City's requirement of a specific plan as a rational planning device. Specific plans are authorized by state law as a mechanism to achieve logical development patterns and to coordinate the provision of infrastructure. Cal.Gov't Code §§ 65450–51. In this case the City has imposed the specific plan requirement on fifty-five acres of land, most of which has been used for strawberry farming for several decades. It is reasonable for a municipality to delay development of this size and type of agricultural property until it planned the development of roads, sewage, disposal, water distribution, drainage, traffic, and utility services. The Kawaokas argue that a specific plan is unnecessary because they do not need to build more roads and because sufficient drainage, sewage, and other resources already exist. Whether or not they are right as to the adequacy of current facilities, requiring a plan to ensure coordinated development of a significant parcel of land and to ensure that adequate resources exist is not irrational. The properties also face the common problem of accumulated pesticide residue in the soil from the history of agricultur-

al use—an environmental problem that the City clearly will need to address prior to permitting residential development.

The Kawaokas argue that the specific plan requirement is unconstitutional because it obligates them to act jointly with the owners of the other twenty acres prior to developing their own land. While it is true that the specific plan cannot be promulgated in piecemeal fashion, nothing in the California Code requires joint action by parties subject to a specific plan requirement. Moreover, because the specific plan is enacted legislatively, no party can impose his plan on other landowners simply because they are subject to the same plan requirement. Instead, under the City's ordinance an affected individual may submit to the City Council a specific plan for the City's review and adoption, and City regulations specifically state that parties whose property is covered by a specific plan requirement need not act jointly.[7] Thus, landowners subject to a specific plan requirement may submit their proposals either jointly or individually to the City Council, which will enact a specific plan with the features it determines to be most appropriate.

The Kawaokas next argue that the specific plan requirement is unconstitutional because (1) the City imposes a fee on property owners for developing the specific plan, and (2) the City, which is the only party authorized to prepare a specific plan, refuses to do so and instead requires the Kawaokas to do it, thus holding their land hostage. With respect to the first claim, the fact that the City imposes a fee for the development of specific plans is not a constitutional deprivation. *See* Cal.Gov't Code §§ 65456(a) & (b) (West. Supp.1994). Cities often impose permit requirements and assess processing costs on individuals, particularly on those who seek to develop their land. The rationale behind this fee is clear: a party receives significant economic benefits from developing her land; the taxpayers should not bear all of the costs of planning such a development. *See* Cal.Gov't Code § 65456(a) (West. Supp.1994) (stating that it is the legislature's intent that people who benefit from a specific plan pay some of the costs of developing these plans).[8]

The record does not support the Kawaokas' second claim. We have already noted that the City ordinance does not state that only the City may prepare a specific plan, but instead provides that property owners may submit their own. The Kawaokas' argument actually reflects the fact that they are unwilling to pay any of the costs of developing a specific plan, and not that the City refuses to prepare a plan at all or to consider one prepared by the Kawaokas.

Throughout their brief, the Kawaokas argue that their land has been deprived of all economic value. The record does not support this claim. Instead, it reveals that the Kawaokas are unwilling to sell their land for less than $6 million. Furthermore, an appraisal performed in February 1991 of thirty-six acres of their property estimated its value at $2,400,000. This is certainly much less

7. The Kawaokas argue that the district court misapplied *Sederquist v. City of Tiburon*, 765 F.2d 756 (9th Cir.1984). The district court properly interpreted *Sederquist* to question whether a city may properly require joint action by property owners of a subdivision to satisfy a condition precedent to approval of an application to develop their land. *See Kawaoka*, 796 F.Supp. at 1326. There is no such joint action requirement in this case.

The Kawaokas also argue that the district court found the specific plan requirement to be reasonable only because specific plans are authorized under state law. This mischaracterizes the district court's opinion, which actually found the requirement to be valid because it is a "conceivably rational means of attaining ... larger community goals." *Id.* at 1326.

8. The Kawaokas cite *Harris v. County of Riverside*, 904 F.2d 497 (9th Cir.1990), for the proposition that the City may not require them to pay fees to regain viable use of their land. This case is inapplicable. *Harris* is a procedural due process case in which a local planning agency specifically rezoned the plaintiff's land by revising the general plan without providing notice to the plaintiff. *Id.* at 501–04. In *Harris* we recognized that the only way in which the plaintiff could object to the general plan amendment would be to pay an application fee to reamend the plan. Because the plaintiff was not warned during the planning process that his property had been targeted specifically for rezoning, he was denied procedural due process. *Id.* In the present case, the Kawaokas were apprised of the proposed general plan amendments and they participated fully in the hearing process. They do not have a procedural due process claim.

than $6 million, but it is nonetheless substantial value.

### C. *The Rural Residential Designation*

In adopting the general plan, the City advanced several objectives, including preserving the agricultural heritage of the City, providing for a range of housing types and densities, preserving the "small town" character of the City, and limiting development within the City to levels consistent with available resources. Our circuit and others have established that these are legitimate objectives. *See Christensen,* 995 F.2d at 165 (preserving agricultural uses of land); *Smithfield Concerned Citizens for Fair Zoning v. Smithfield,* 907 F.2d 239, 244–45 (1st Cir. 1990) (density restrictions may enhance quality of life); *Barancik v. County of Marin,* 872 F.2d 834, 837 (9th Cir.1988), *cert. denied,* 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 193 (1989) (preserving bucolic atmosphere); *Petaluma,* 522 F.2d at 906 (preserving small town character). Moreover, designating seventeen acres for rural residential density is a reasonable means by which the City may reduce potential traffic problems and address the anticipated water shortage due to population growth.

 The Kawaokas raise several challenges with respect to the density designation of their property. First, they argue that the general plan did not in fact designate their property RR and SF, but instead retained the agricultural designation until the Kawaokas prove such use is economically non-viable. We have already noted that while the language of the general plan suggests that the property was designated for agricultural use, the plan map, the City Council meeting minutes, and the statements of city officials all indicate that the property was designated RR and SF. *See* note 2, *supra.* Even the Kawaokas' real estate

agent and potential purchaser appear to understand that the property has been designated for residential use, as demonstrated by their respective letters which object to the dual designation and offer less money for the property in recognition of the RR and SF designations.

The Kawaokas also contend that the ambiguity created by the plan's language and map render the plan unconstitutionally vague. The plan is not unconstitutionally vague, however, because consultation with city officials resolved any ambiguity regarding the meaning of the general plan. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (stating that regulations are not unconstitutionally vague where "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry"); *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 48–49, 86 S.Ct. 1254, 1263, 16 L.Ed.2d 336 (1966) (statutory definition of "related person" is not unconstitutionally vague when appellants have access to an agency process that will clarify the issue).

 The Kawaokas next argue that designating half of their property "RR" is impermissible "spot zoning" because it is inconsistent with surrounding uses. Spot zoning occurs where "a small parcel is restricted and given lesser rights than the surrounding property ... thereby creating an 'island' in the middle of a larger area devoted to other uses." [9] *Consaul v. City of San Diego,* 6 Cal.App. 4th 1781, 1801, 8 Cal.Rptr.2d 762 (Cal.Ct.App.1992).

 The Kawaokas' spot zoning challenge fails for several reasons. First, "spot zoning" refers to property that is small in size. *See Hamer v. Ross,* 59 Cal.2d 776, 382 P.2d 375, 31 Cal.Rptr. 335 (1963) (2.2 acres

---

**9.** According to the California courts,

 Usually spot zoning involves a small parcel of land, the larger the property the more difficult it is to sustain an allegation of spot zoning. Likewise, where the 'spot' is not an island but is connected on some sides to a like zone the allegation of spot zoning is more difficult to establish since lines must be drawn at some point. Even where a small island is created in

the midst of less restrictive zoning, the zoning may be upheld where rational reason in the public benefit exists for such a classification. *Consaul v. City of San Diego,* 6 Cal.App. 4th 1781, 1801–02, 8 Cal.Rptr.2d 762 (Cal.Ct.App. 1992) (quoting *Viso v. State of California,* 92 Cal.App.3d 15, 22, 154 Cal.Rptr. 580 (Cal.Ct.App. 1979) (citations omitted)).

zoned for 1 unit per acre where all surroundings lots are much smaller); *Ross v. City of Yorba Linda*, 1 Cal.App. 4th 954, 960, 2 Cal.Rptr.2d 638 (Cal.Ct.App.1991) (1.12 acre lot zoned for 1 unit per acre where surrounding lots generally half that size). On the facts presented, the Kawaokas' seventeen acre parcel is too large to be considered spot zoning.

Furthermore, this case is unlike spot zoning cases, in which " 'a lot in the center of a business or commercial district is limited to uses for residential purposes.' " *See Consaul*, 6 Cal.App. 4th at 1801, 8 Cal.Rptr.2d at 775 (citations omitted); *see also Nectow v. Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928) (zoning 100 foot strip of ¾ acre lot for residential use where strip is surrounded by industrial use is unreasonable). The Kawaokas' property is surrounded by a variety of other types of residential property, including R–1 (single family residential), R–2 (duplex residential), and R–3 (multi-family residential). It will not be a small island amid land zoned for dissimilar uses.

Not only is there no support in the case law to find spot zoning in this case, but to define spot zoning to include zoning of parcels of this size would paralyze urban planners, who under certain circumstances need to draw lines and differentially zone much smaller areas of land than this.

The Kawaokas argue that the district court failed to consider their declarations, in which representations are made that there is adequate infrastructure to accommodate development at the density they requested. Even if this were true, the Kawaokas fail to state a due process violation because there is no law requiring the city to zone property for maximum use and density. Such an approach to land use planning would prohibit municipalities from zoning property for anything less than maximum development, an approach that has clearly been rejected.

D. *The Water Moratorium*

The Kawaokas next argue that the City's water moratorium was arbitrary and a mere pretext for blocking development on their property. They cite to Johnson's declaration, in which he states that Paul Karp, a city engineer, told him that the City was using water as a pretext to stop development. This claim fails for several reasons.

■ First, as the district court noted, the temporary moratorium lasted only a year; it merely limited new development plans during that time period and did not in any way restrict the processing of specific plans. Because the Kawaokas may not develop their property until a specific plan is prepared, and because the moratorium did not deter the processing of specific plans, the water moratorium did not delay any development efforts by the Kawaokas. But even if it could be argued that the moratorium delayed development of their property for one year, such a short-term delay does not rise to constitutional dimensions. *See Agins*, 447 U.S. at 263 n. 9, 100 S.Ct. at 2143 n. 9; *Zilber*, 692 F.Supp. at 1206.

■ The record also supports the City's decision to enact the water moratorium as a rational one. Although the Kawaokas point to a declaration that the water moratorium was a pretext for preventing development, the City points to estimates by its Department of Public Works that if all pending development applications were approved, it would face a water shortage of 637 to 833 acre feet per year. Given the serious drought conditions and water shortages faced by California cities, we cannot say that the City's efforts temporarily to limit development while it studies its future water supply is irrational.

■ Except for a declaration that merely asserts that the moratorium is pretextual, the Kawaokas do not provide any evidence that this is so.[10] This case is therefore unlike

10. The Kawaokas argue that the district court was incorrect in holding that they were required to submit expert affidavits to counter the City's water experts. The existence of a water shortage is precisely the type of issue on which expert testimony is necessary. But even if expert testimony is not mandatory, the Kawaokas only point to a hearsay statement attributed to Paul Karp, a city engineer, that the water shortage is a pretext used to limit development. They provide no numerical data or direct evidence to suggest that the City's numbers are contrived or inaccurate.

*Lockary v. Kayfetz*, 917 F.2d 1150 (9th Cir. 1990), the case cited by the Kawaokas. In *Lockary*, we held that a moratorium on new water hookups might be arbitrary where the plaintiffs demonstrated that during the moratorium water use increased by 70%, water storage capacity increased by 1100%, the city had provided water for swimming pools, the city had voluntarily relinquished rights to certain water sources, and the leakage rate for the City's water was at least twice normal. *Id.* at 1155–56. Unlike the plaintiffs in *Lockary*, the Kawaokas provide no evidence to suggest that the City's numbers are in fact contrived.

The Kawaokas also argue that they have evidence that demonstrates that if their property is converted to residential use at 5.0 units/acre, it would still require less water than they currently use for strawberry farming. Assuming this is true, these numbers do not make a one year water moratorium irrational or pretextual. The record supports the City's argument that in enacting the moratorium, the City was responding to a perceived water shortage faced by the entire community. *See Barancik*, 872 F.2d at 836–37 (zoning ranch area to preserve rural landscape is not irrational merely because as many cows would graze on plaintiff's property if there were twenty-eight residences as would graze if there were nine). The record simply does not support the contention that the one-year moratorium (now expired) was mere pretext for preventing all development on the Kawaokas' property.

### E. *Summary*

We conclude that the Kawaokas have failed to plead or present sufficient evidence to allow their substantive due process challenges to go to trial. The Kawaokas cite to several cases for the proposition that they are entitled to a jury trial and that summary judgment is inappropriate. However, unlike those cases, in which we found that the plaintiffs did in fact provide some evidence suggesting that a city's actions were irrational, the Kawaokas have failed to provide such evidence. *See Del Monte Dunes*, 920 F.2d 1496 (city acts irrationally where it approves 190 unit project provided that fifteen condi-

tions are met, plaintiffs fulfill those conditions over an eighteen month period, and city denies permit, giving only conclusory explanation); *Lockary*, 917 F.2d 1150 (water moratorium may be arbitrary where city has significantly increased provision of water to other parties); *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir.1988) (city's refusal to issue building permit is irrational where Bateson meets all of the requirements for the permit and city regulations require the city to issue a permit in these circumstances). Furthermore, this is not a takings case, in which we must balance the public interest supporting the government action against the severity of the private deprivation; in a substantive due process case such as this, our concern is with the rationality of a government action regardless of its impact. *See* Kenneth H. Young, 1991 Zoning & Planning Law Handbook §§ 7.02–7.03 at 144–45 (1991); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834 n. 3, 107 S.Ct. 3141, 3147 n. 3, 97 L.Ed.2d 677 (1987). The takings cases cited by the Kawaokas that discuss the need to consider the harm to the plaintiff are therefore inapplicable.

Because the Kawaokas do not raise a genuine issue of material fact as to whether the City's general plan and water moratorium are irrational or arbitrary, the district court properly granted the City's motion for summary judgment with respect to the Kawaokas' substantive due process challenges.

### III. *Equal Protection Challenge*

The Kawaokas claim that the City's actions were motivated by a racial bias against persons of Japanese ancestry. They also argue that even if the actions were not race-based discrimination, the City's actions discriminated against farmers and were arbitrary.

### A. *Evidence of Racial Discrimination*

■ "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race ... [courts] presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *New Orleans v. Dukes*, 427 U.S.

297, 303–04, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Because zoning and land use issues do not implicate fundamental rights, *Christian Gospel Church, Inc. v. San Francisco*, 896 F.2d 1221, 1225 (9th Cir.), *cert. denied*, 498 U.S. 999, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990), in order to invoke strict scrutiny in this case the Kawaokas must demonstrate that the City intentionally discriminated on the basis of race. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Discriminatory intent may be proved by direct or indirect evidence. *Id.* at 266, 97 S.Ct. at 563; *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir.1991).

The strongest evidence of discriminatory intent consists of two statements made by Doris Olsen, a member of the City Council, to Stephanie Forrest, the Kawaokas' real estate agent, and Cheryl Christner, Ms. Forrest's assistant. Forrest contends that when informed that the City's designation of the Kawaokas' property had decreased its value, Olsen stated "Why should these Japanese people make all that money?" and "Why should these people make so much money?" (CR 35, Exh. 19). These deplorable remarks are insensitive and disturbing and are evidence of prejudice. However, they are insufficient to raise a claim that the governmental action was on account of racial discrimination.

The district court analogized this situation to *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d at 465. *See Kawaoka*, 796 F.Supp. at 1330–31. In *Henderson*, a president of a minority-owned bank sued a federal bank regulator who encouraged the bank's board of directors to fire the president. 940 F.2d at 465. To support his claim of racial discrimination, the plaintiff pointed to a statement by the bank regulator from which one might infer discriminatory intent. Because we found rational reasons for the regulator's actions, including a federal report on the bank that stated that the president's "unsatisfactory management has resulted in the bank's current insolvent condition," we ruled that one statement without additional evidence of racial discrimination was insufficient to state a claim. *Id.* at 469, 473 & n. 16. In the present case, given the many reasons articulated by the City to support its decisions, including the desire to preserve agriculture and the City's small-town character, its concern that infrastructure might not support immediate development, and its concerns about the water adequacy and increase in traffic, Olsen's repugnant statements are insufficient to demonstrate that she acted with discriminatory intent.

Furthermore, the fact that Olsen made two deplorable comments off-duty does not mean that the *City* may be held liable for discrimination. A municipality may only be held liable under § 1983 for a violation that stems from "official municipal policy." *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Municipal liability attaches where there is a deliberate choice made by officials with responsibility for establishing final policy, and the question of who has final decisionmaking authority is a question of state law. *City of St. Louis v. Prapotnick*, 485 U.S. 112, 124–27, 108 S.Ct. 915, 924–26, 99 L.Ed.2d 107 (1988). Under California law, Olsen did not have final decisionmaking authority because the City Council must adopt a general plan by a majority vote. Cal.Gov't Code § 65356 (West Supp.1993). In this case, the council adopted the plan unanimously and there is no evidence that any other council member acted with discriminatory intent or that the council as a whole took the action with discriminatory intent. *See Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 878–79 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988) (county supervisor who votes on issue even though he had a conflict of interest does not have authority to establish county policy where board of supervisors may only act by majority vote).[11]

The Kawaokas point to additional indirect evidence of racial animus, but this evidence is

---

11. The Kawaokas also argue that the district court was incorrect in ruling that the city council members were absolutely immune from liability for legislative acts because their actions were not legislative in nature. *See Kawaoka*, 796 F.Supp. at 1332. The district court correctly noted that zoning enactments that affect large populations are legislative in nature. *Kuzinich v. County of*

extremely weak. Specifically, they point to statements by Craig Kawaoka that he had observed racial discrimination against other Japanese individuals. Most of these alleged incidents of discrimination concern conditions that the City placed on the development of property owned by other Japanese landowners and are quite vague.[12] These incidences are not sufficient evidence of discrimination because it is not unusual for property to be down-zoned or for development to be subject to conditions. Unless the Kawaokas can demonstrate that non-Japanese property owners are permitted to develop their land without similar restrictions, we cannot conclude that the City's actions in these cases were racially-motivated or unreasonable.

## B. *Rationality Review*

When there is insufficient evidence of racial discrimination, we review the City's actions to determine whether the Kawaokas' property has been treated differently from similarly situated property and whether there is any rational basis for such treatment. *Jacobs, Visconsi & Jacobs Co. v. City of Lawrence*, 927 F.2d 1111, 1119 (10th Cir. 1991); *Christian Gospel Church*, 896 F.2d at 1225.

The Kawaokas' equal protection claim must fail because there is no evidence in the record that property similar to the Kawaokas was treated differently. Unfortunately for the Kawaokas, it may be impossible to provide this evidence, as the Kawaokas' land and the neighboring twenty acres are in fact unique in Arroyo Grande.

However, the record also does not support the claim that the Kawaokas were singled out

for special treatment as compared to owners of nonagricultural property. The Kawaokas argue that they were treated unfavorably at the City Council hearings because other property owners' requests for amendments to the general plan were granted. For example, they contend that the City inappropriately approved a high-density apartment complex on a steep hillside. Assuming this to be true, we cannot conclude from this fact that the City's RR designation of the Kawaokas' property is discriminatory. Minutes from the City Council meetings indicate that while the Council granted many requests for amendments, it also refused to grant several landowners the designations that they requested. For example, the record reflects that the Ellsworth property was forced to remain agricultural, an Alder Street property was denied its desired condominium designation, and the Stillwell property was designated RR rather than SF. The minutes also reflect that in most cases, the City Council merely accepted the recommendations of the Planning Commission. Finally, the general plan map also indicates that a specific plan requirement was imposed on at least six separate parcels of land, demonstrating that the City did not single out the Kawaokas to impose a specific plan requirement.

In the end, even if the Kawaokas were singled out for different treatment, the City has provided a rational explanation for why the general plan treats the Kawaokas' property as it does. The specific plan requirement permits the City to coordinate roads, sewage disposal, utilities, easements, drainage and water distribution. And the density designation serves to preserve agriculture, to

---

*Santa Clara*, 689 F.2d 1345, 1349–50 (9th Cir. 1982). Adopting the general plan and the water moratorium, both of which affected the entire community of Arroyo Grande, were legislative acts. Appellants provide no evidence that suggests that the City acted separately from the general plan amendment to single out the Kawaokas for special treatment. *See Harris*, 904 F.2d at 501–02 (city acts to rezone plaintiff's land, without notice, after third party requested a change in zoning); *see also Bateson*, 857 F.2d at 1303 (city's refusal to issue specific building permit is executive act).

**12.** Mr. Kawaoka first refers to his friend Tom Ikeda, who was required to put in a pipeline or a

drainage before he could complete a development project. Ikeda informed Kawaoka that when his uncle complained that the conditions were blackmail, the City replied "just think of it as payment to the City." Next, Kawaoka states that his brother spoke with Gary Kobara, who was also required to meet certain unspecified conditions which he felt were unnecessary before he received final approval for a development. Third, Kawaoka stated that he observed that Chio Okui's property was repeatedly downzoned and that the City repeatedly placed numerous conditions for development on the property. He also stated that Hilo Fuchiwaki cannot get his land designated for residential use.

limit development, and to provide for a range of housing types.

Because the Kawaokas were unable to provide sufficient evidence to suggest that the City intended to discriminate on the basis of race, and because the Kawaokas did not demonstrate that they were irrationally singled out for differential treatment, the district court properly granted summary judgment for the City on the Kawaokas' equal protection claim.

## CONCLUSION

We hold that the Kawaokas' "as applied" challenge is not ripe for review. We also hold that there are no genuine issues of material fact as to any of the Kawaokas' substantive due process or equal protection claims against the City. Accordingly, the district court's order granting the City's motion for summary judgment is AFFIRMED.