3570 EAST FOOTHILL BLVD., INC., a California corporation, Plaintiff,

v.

CITY OF PASADENA, a Municipal corporation, William M. Paparian, Mayor of the City of Pasadena, Alvin James, Director of Planning and Permitting of the City of Pasadena, and Carol Hunt Hernandez, Advance Planner for The City of Pasadena, Defendants.

No. CV 95–5592 ABC RMCx.

United States District Court, C.D. California.

Oct. 6, 1997.

Roger J. Diamond, Santa Monica, CA, Edward A. Weiss, Anaheim, CA, for plaintiff.

Tracy Webb, Acting City Atty., for City of Pasadena, Benjamin Kaufman, Dawn R. Andrews, Freilich, Kaufman, Fox & Sohagi, Los Angeles, CA, for defendants.

ORDER RE: DEFENDANT CITY OF PASADENA'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

COLLINS, District Judge.

Defendant's motion for summary judgment or in the alternative partial summary judgment came on regularly for hearing before this Court on October 6, 1997. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is

hereby ORDERED that Defendant's motion is GRANTED.

## I. Factual and Procedural Background

The facts of this case are well known to the parties and do not need to be recited here. A brief summary of the facts relevant to the instant motion follows.

Plaintiff, 3570 East Foothill Blvd., Inc. ("Plaintiff") is a California corporation that owns 20/Twenty Gentleman's Club, formerly known as the "Red Hot Cafe," a restaurant/lounge/bar in the Defendant City of Pasadena ("City"). Plaintiff's restaurant offers non–adult live entertainment, including, as a result of the Court's prior Order, "bikini dancing." Plaintiff now seeks to expand the restaurant's business to include topless dancing, which would render the "20/Twenty" an "adult business" under Pasadena Municipal Code ("P.M.C.") § 17.16.050.

The City asserts that Plaintiff cannot offer adult entertainment because the "20/Twenty" is not in the appropriate zone for adult businesses. The City claims that the "20/Twenty" is located in an Industrial General ("IG") zone, where adult businesses are not permitted. *See* P.M.C. §§ 17.28.020 & 17.32.030. Under the P.M.C., adult businesses are permitted only in Commercial General ("CG") zones. *Id.* Therefore, if the City is correct in stating that the "20/Twenty" is located in an IG zone, Plaintiff is not permitted to offer adult entertainment at the "20/Twenty's" current location.

However, Plaintiff disputes that its business is located in an IG zone. Plaintiff asserts that, as of January 23, 1995, the Pasadena City Council gave effect to an "Interim East Pasadena Specific Plan" ("Specific Plan") which changed the zone in which Plaintiff's business is located to a CG zone. Alternatively, Plaintiff contends that the City has delayed its implementation of the "East Pasadena Specific Plan" for the purpose of "preventing and prohibiting Plaintiff from presenting topless dancing at its place of business." Supp. Comp. at ¶ 14. Furthermore, Plaintiff alleges that even if its business is not located in a CG zone, the City's entire adult business zoning scheme is unconstitutional because it provides too few permissible locations for adult businesses, denying them a reasonable opportunity for expression in violation of the free speech and due process clauses of the First and Fourteenth amendments. Therefore, Plaintiff asserts that it is entitled to offer adult entertainment, regardless of the zone in which its business is located.

On August 21, 1995, Plaintiff filed a Complaint against Defendant, the City of Pasadena ("City"), under 42 U.S.C. § 1983, seeking a declaratory judgment that Pasadena's adult business zoning ordinances, conditional use permit and live entertainment permit ordinances are unconstitutional on their face. In addition to a declaratory judgment, Plaintiff seeks injunctive relief, damages, costs, and attorney's fees under 42 U.S.C. § 1988. On October 17, 1995, Plaintiff filed a First Amended Complaint ("FAC") on the same grounds, seeking similar relief, but additionally requesting a declaratory judgment that the "20/Twenty" is located in a CG zone under the "Specific Plan." [1]

Also on October 17, 1995, Plaintiff applied for a temporary restraining order ("TRO") to enjoin enforcement of Pasadena's conditional use permit and live entertainment permit ordinances. On October 26, 1995, the Court granted Plaintiff's TRO, thus enjoining the enforcement of the City's permitting ordinances. In the same Order, the court consolidated the trial on the merits of Plaintiff's constitutional challenge to the permitting ordinances with the hearing on Plaintiff's application for a preliminary injunction against enforcement of the City's adult zoning ordinance. The consolidated trial and hearing took place before the Court on November 17, 1995. In its November 27, 1995 Order (amended by Minute Order on December 12, 1995) the Court permanently enjoined the City from enforcing its conditional use permit and live entertainment ordinances as to all expressive activities protected by the First Amendment. In its December 20, 1995

---

**1.** On November 16, 1995, the City filed an Answer to Plaintiff's First Amended Complaint. In its Answer, Defendant demanded a jury trial.

Order, the Court denied Plaintiff's application for preliminary injunction ordering the City to apply terms of the "Specific Plan" changing its business' zone from IG to CG and denied Plaintiff's application for an injunction against the City's enforcement of its adult business zoning restrictions.

On April 28, 1997, Plaintiff filed a Supplemental Complaint alleging that the City has delayed completion of the Environmental Impact Report necessary to amend its General Plan to achieve consistency with the "East Pasadena Specific Plan" for the predominate purpose of preventing Plaintiff from presenting topless dancing.[2] On July 22, 1997, the City filed the instant motion for summary judgment or in the alternative partial summary judgment on the three remaining issues in this case: (1) whether the City has given effect to the January 23, 1995 Draft East Pasadena Specific Plan such that Plaintiff's business is now in the proper zoning for an adult business; (2) whether the predominate purpose of the City's failure to adopt the East Pasadena Specific Plan is to prevent Plaintiff from exercising its First Amendment rights; and (3) whether there are sufficient alternative sites in the City for adult businesses to locate to provide them with a reasonable opportunity for expression. On July 29, 1997, Plaintiff filed an Opposition to the City's Motion for Summary Judgment. The City filed a Reply on September 29, 1997.

## II. Discussion

### A. Summary Judgment Standard

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a

showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986). Furthermore, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. at 2553–54. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. "The mere existence of a scintilla of evidence in support of the plaintiff's position

---

2. On July 28, 1997, the City filed an Answer to Plaintiff's Supplemental complaint. In its Answer, Defendant demanded a Jury trial.

will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. at 2510; *Griffeth v. Utah Power & Light Co.,* 226 F.2d 661, 669 (9th Cir.1955).

## B. Analysis

In the instant case, it is the nonmoving party—Plaintiff—who bears the burden of proof at trial. Thus, to prevail on this motion, the moving defendant, the City, must initially establish that there is an absence of evidence to support Plaintiff's claims. To overcome this motion for summary judgment, Plaintiff must then set forth sufficient evidence on which a reasonable jury could reasonably find in its favor.

Plaintiff alleges causes of action pursuant to Section 1983 of Title 42 of the United States Code. The Court addresses each of Plaintiff's remaining claims in turn.

### 1. City's Implementation of the East Pasadena Specific Plan

■ The City contends that as a matter of law it has not given effect to the January 23, 1995 version of the Draft East Pasadena Specific Plan, and thus Plaintiff's business has not been rezoned CG. City Mot. at 23:3–5. A specific plan is designed for the systematic implementation of a City's General Plan for part or all of the area covered by the General Plan. Cal. Gov't.Code § 65450. The California Environmental Quality Act ("CEQA") requires the completion of an EIR before a specific plan can become effective. *See A Local and Regional Monitor v. City of Los Angeles,* 16 Cal.App.4th 630, 640, 20 Cal.Rptr.2d 228 (1993) ("An EIR ·is required whenever a pubic agency proposes to approve or carry out any project which may have a significant effect on the environment."). Furthermore, the City Council must make a finding that the specific plan is consistent with the City's General Plan before the specific plan may be adopted. *Id.* at 647, 20 Cal.Rptr.2d 228; Gov't.Code § 65454.

■ In support of its motion for summary judgment, the City sets forth evidence to establish that the Specific Plan has not been officially adopted in accordance with California law. First, the City points to a draft of an "Initial Study" of the approved Draft East Pasadena Specific Plan which states that the "proposed project MAY have a significant effect on the environment, and a ENVIRONMENT IMPACT REPORT IS required" (emphasis in original), as well as a memorandum to Carol Hunt, Associate Planner, from Nancy Key, Sr. Planner, Environment, regarding the Initial Study of the Specific Plan, dated April 3, 1995, in which she agrees that an EIR is needed. City Mot. Ex 13–14. The required EIR has not been completed to date, and thus the City has not yet complied with the requirements of CEQUA in order to adopt the plan.

Furthermore, the City's designated expert witness, Lloyd Zola, has declared that "the most recent version of the Draft East Pasadena Specific Plan is inconsistent with the adopted City of Pasadena General Plan." Zola Decl. at ¶ 5(c). Therefore, according to California Law, the Specific Plan could not have been adopted. Not only have there been no findings of its consistency with the General Plan, the Specific Plan is actually inconsistent with the General Plan according to the City's expert.

In addition, the City's Director of Planning and Permitting, Alvin D. James, points out that:

> On January 23, 1995, the City Council by motion authorized staff to move forward to bring back on the Council's agenda an East Pasadena Specific Plan. Preparatory to its decision, the Council was presented with a draft of this specific plan, that had been reviewed by the City's Planning Commission, among others. Council was asked to give conceptual approval to the specific plan, so that staff could undertake further steps necessary to allow for its further review and hopeful approval by the Council. Specifically, Council directed the City staff to: a. Prepare an Environmental Impact Report on the project; b. Prepare proposed amendments to the City's General Plan to achieve consistency between the

General Plan and the East Pasadena Specific Plan; and c. Prepare proposed amendments to the City's Zoning Ordinance, Title 17 of the City's Municipal Code, to achieve consistency between the City's zoning and the East Pasadena Specific Plan's regulations and designations. James Decl. at ¶ 16.

The City thus argues that the final plan was not approved by the City Council. Instead, the City gave "conceptual approval" to a draft plan in order to begin the process necessary for its final approval. Furthermore, a specific plan may not be adopted by a motion, but must be adopted in accordance with procedures followed in adopting a General Plan (an affirmative majority vote of the Planning Commission), or by a resolution or ordinance. Gov't.Code §§ 65354, 65453.

Plaintiff fails to present any evidence to establish that the City did adopt the East Pasadena Specific Plan. In fact, Plaintiff presents deposition testimony of Carol Hunt Hernandez, an Associate Planner, in which Ms. Hernandez responded "yes" to the question, "would it be your opinion that, in effect, the stopping of the EIR process, for all practical purposes, stopped the entire process of implementation of the Specific Plan ... ?". Kaltenthaler Decl. at Ex. L 70:6–11. Thus, Plaintiff is aware that the Specific Plan could not have been officially adopted in compliance with California law. Additionally, Plaintiff conceded at the preliminary injunction hearing in this Court on November 17, 1995, that the "Specific Plan" was never actually adopted by the Pasadena City Council. *See 3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1257, 1261 (C.D.Cal. 1995).

Instead, Plaintiff tries to establish in its Opposition that the City gave effect to the "Interim East Pasadena Specific Plan." Plaintiff submits the Agenda Report from the City Manager to the City Council dated January 23, 1995. In that report, the City Manager recommends that the City Council approve the Draft East Pasadena Specific

Plan and recommends in its conclusion that "the Draft East Pasadena Specific Plan be utilized for General Plan Consistency determinations pending its final adoption at the conclusion of the environmental impact report process." Kaltenthaler Decl. Ex. G. Plaintiff thus contends that the Draft Plan was given effect as of January 23, 1995, at which time the City Council approved the Draft Plan. Kaltenthaler Decl. at ¶ 8; Ex.H (City Council Minutes January 23, 1995).[3] Plaintiff asserts that this meeting gave effect to the Specific Plan, and that the Specific Plan now bears an "interim effective date" of January 23, 1995. This January draft states:

> Following the interim effective date of this Specific Plan, whenever land use regulations and/or development standards are imposed, the same shall control the use and development of all lots in the Specific Plan area, to the exclusion of the regulations and/or development standards contained in the City of Pasadena Zoning Code ..., to the extent as any provision of the Pasadena Zoning Code is inconsistent with any provision of the Specific Plan.

Kaltenthaler Decl. Ex. I at 59.

Thus, it is Plaintiff's position that a genuine issue of material fact exists as to whether the Specific Plan has been given effect by the City, such that the designation by the Specific Plan of its business as within the CG zone controls.

However, Plaintiff does not present any evidence to contradict James' statement that:

> The Draft East Pasadena Specific Plan dated January 23, 1995 ... is not, as plaintiff contends, the draft that was before the City Council on this date. Instead, it is the most recent draft, prepared subsequent to the January meeting. It was given this date to reflect the fact that January 23, 1995 is the last date that any public forum or public meeting was held to give input on the document. The draft

---

**3.** The Minutes show that the City Council's Motion to approve staff recommendations was unanimous, including the recommendation by the City Manager to authorize staff "to initiate

General Plan Amendments to achieve consistency between the General Plan and the Draft East Pasadena Specific Plan." Kaltenthaler Decl. Ex. H, at 52–53.

that was before the City Council on January 23, 1995 was dated December 14, 1994. James Decl. at ¶ 18.

Rather, in its Statement of Genuine Issues Plaintiff merely disputes the City's contention and refers to the Kaltenthaler declaration. Pl. Stmt. of Gen. Issues at ¶ 32. However, nowhere in the Kaltenthaler declaration has Plaintiff provided evidence to dispute the James declaration. Furthermore, the City points out that the Draft East Pasadena Specific Plan could not be given interim effect under California Law.[4] Even assuming that the recommendation was made as Plaintiff contends, Plaintiff has failed to present evidence that the City did in fact implement the Specific Plan. Nowhere in its Opposition or the Kaltenthaler declaration does Plaintiff point to amendments made to the General Plan in order to achieve consistency with the Specific Plan, or to the City's approval of projects in accordance with the Specific Plan's zoning provisions. James contends that the City "continues to review all development proposals in the area encompassed by the East Pasadena Specific Plan pursuant to the existing Zoning and General Plan." James Decl. at ¶ 22. Plaintiff disagrees with this statement, stating that "[apparently for some projects the City has allowed projects to go forward and has treated them as though the property were already rezoned CG.]" Pl. Stmt. Gen. Issues at ¶ 36. Plaintiff offers the Kaltenthaler declaration as evidence of these projects. *Id.* However, the Kaltenthaler declaration does not in fact identify or discuss these projects or present any evidence that the City has approved projects as if the area were rezoned CG.[5] Thus, the City has pointed to an absence of evidence to support Plaintiff's claim that the Specific Plan was given effect by the City, and Plaintiff has failed to present evidence on which a reasonable jury could find that the City has given effect to the Specific Plan.

## 2. City's Motivation in failing to adopt the East Pasadena Specific Plan

### a. Standard

Plaintiff contends that the predominate reason that the City has not taken measures, such as completing the EIR, to enact the Specific Plan is to prevent Plaintiff from presenting topless dancing in violation of its First Amendment rights. The Specific Plan, as a zoning/land use measure to change the East Pasadena area from IG to CG, does not implicate a fundamental constitutional right. Plaintiff does not have a constitutional right to have its property zoned CG. When reviewing such a decision, therefore, the court need only ask "whether or not the provision is rationally related to a permissible state objective." *Christian Gospel Church, Inc. v. San Francisco*, 896 F.2d 1221, 1225 (9th Cir.1990), *cert. denied*, 498 U.S. 999, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990) (citing *Rinaldi v. Yeager*, 384 U.S. 305, 308–09, 86 S.Ct. 1497, 1499–1500, 16 L.Ed.2d 577 (1966)). To invoke strict scrutiny, Plaintiff must demonstrate that the City intentionally acted to deprive Plaintiff of its exercise of First Amendment rights. *See Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir.1994) (discussing burden on Plaintiffs who alleged City's action in zoning issue was motivated by intentional racial discrimination).

4. The City submits the deposition of David Watkins, Principal Planner, Advance Planning Section, who explains that the meaning of the interim effective date according to the staff is the date between conceptual approval and actual approval. Supp. Kaufman Decl. Ex. 16 at 0024:7 to 0025:4. However, Mr. Watkins stated that prior to the City Council meeting of January 23, 1995, the staff was informed by the City Attorney that this provision was in fact illegal and thus the recommendation regarding this interim effective date was deleted from the final staff report that went to the City Council. Supp. Kaufman Decl. *Id.* at 0025:7–25; 0026:17 to 0028:3. It is Mr. Watkins understanding that the City Council never adopted the provision in the draft Specific Plan regarding the interim effective date. *Id.* at 0028:4–11.

5. In its FAC, Plaintiff alleges that "the City has routinely construed the effect of the Specific Plan so as to approve all new uses arising since January 23, 1995, which simply meet all the new zoning regulations established by the interim Specific Plan." FAC at ¶ 90. In opposing the City's motion for summary judgment, however, Plaintiff has failed to point to specific facts or instances indicating that the City has approved such new uses.

■ To prove a retaliatory motive, the burden is first on the Plaintiff to show that its conduct was protected by the First Amendment and that this conduct was a "substantial factor" in the City's decision to delay the implementation of the Specific Plan. *See Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). However, if the City shows by a preponderance of the evidence that it would have reached the same decision in the absence of Plaintiff's protected conduct, then the City's decision cannot be said to be unconstitutional. *Id.: see also, Doyle v. Mt. Healthy City School District,* 670 F.2d 59, 61 (6th Cir.1982) (affirming district court's finding on remand that "although protected activity had played a substantial part in the decision not to rehire" a teacher, the board of education had shown by a preponderance of the evidence that it would have made the same decision based on incidents exclusive of the protected speech activity.).

■ Furthermore, a City's motivation for making a land use decision may be determined on summary judgment. In *Kawaoka,* the Ninth Circuit found that racially prejudicial statements made by an off–duty member of the City Council regarding the City's zoning decision were "insufficient to raise a claim that the governmental action was on account of racial discrimination." *Kawaoka,* 17 F.3d at 1239. The Court found that given the City's many other reasons to support its decision, the council member's comments, without additional evidence, were insufficient to state a claim. The court, therefore, affirmed the district court's order granting summary judgment in the City's favor.[6] *Id.*

**b. Analysis**

■ The City contends that it has "numerous reasons that have prevented it from adopting the East Pasadena Specific Plan." City Mot. at 26:20–21. These reasons include uncertainty as to whether the MTA will build a station and parking facility in connection with the Blue Line light rail; the diversion of work from the understaffed Planning and Permitting Department to projects with higher priority "because of their potential for economic revitalization and job creation;" the need to reassess the plan due to its environmental impacts, such as increased traffic;[7] and community concerns relating to environmental impacts unrelated to adult businesses. James Decl. at ¶ 23.

Plaintiff, however, contends that the City's proffered reasons are pretextual. Pl. Opp. at 17:7–10. Plaintiff's allegation is based on deposition testimony of staff in the City's planning office. Plaintiff offers testimony from Laura Dahl, in which Dahl was asked if she had "ever heard that the stoppage on the EIR for the East Pasadena Specific Plan had anything to do with litigation with the City," to which she responded, "[y]es, I heard that." However, when asked if she could recall from whom and when she heard this, Dahl responded "no." Kaltenthaler Decl., Ex. K at 62:1–4. Furthermore, when asked if she thought this meant that the City would not continue to do work on the EIR for the Specific Plan until the instant lawsuit was resolved, Dahl responded: "No ... [I understood it to mean] [t]hat we wouldn't go back to the City Council with a final plan until we had resolved this issue." *Id.* at 62:5–17. Dahl's testimony is based on inadmissible hearsay statements from an unidentified source. But even assuming that these statements were in fact admissible and true, Dahl's testimony only indicates that a final plan would not be presented to the Council, not that further work on the project would

---

6. Plaintiff states that *Kawaoka* is inapposite because it does not involve a First Amendment claim. However, the Court finds that the situation in *Kawaoka* is similar to the one at hand because it involves a municipal zoning decision which does not implicate a fundamental right. *Kawaoka,* 17 F.3d at 1239. Thus, unless Plaintiff establishes a retaliatory motive on the part of the City, the City's decision does not violate the Constitution.

7. The City also supports this contention with a declaration from its designated expert witness, Lloyd Zola, who declares that "[i]nitial traffic analysis prepared for the Draft East-Pasadena Specific Plan indicated that a significant adverse traffic impact would result from the increased land use intensity proposed in the plan. This impact could only be avoided by reducing the intensity of land use proposed in the Specific Plan." Zola Decl. at ¶ 5(e).

be stopped.[8]

Plaintiff also attempts to establish that the City possessed a retaliatory motive in halting work on the Specific Plan with deposition testimony of Carol Hunt Hernandez, an Associate Planner. When asked if anyone had expressed to her reasons for the stoppage of the EIR and what reason was expressed, Hunt Hernandez responded, "Yes. I guess so ... There are a variety of reasons. This [litigation] was one of them." *Id.*, Ex. L at 73:7–24. Notwithstanding that the witnesses Plaintiff deposed had not actually determined the reasons that the EIR was stopped, but had only heard about the reasons, Plaintiff fails to rebut the City's proffered reasons for postponing the implementation of the Specific Plan. Even assuming that this litigation was one of the factors in the City's decision, Plaintiff has not shown that it was a "substantial" factor.[9] Furthermore, Plaintiff has failed to raise evidence to rebut the City's contention that it would have made the same decision based on other factors, such as the traffic study or awaiting confirmation from the MTA, regardless of the instant lawsuit. One factor out of several does not constitute a motivating factor.

Like the plaintiffs in *Kawaoka*, Plaintiff's only evidence of a retaliatory motive rests on comments made to City Planning staff, in this case by unknown or unidentified individuals. Plaintiff has not provided any additional evidence of a retaliatory motive. Thus, given the "many reasons articulated" by the City to support its decision to delay implementation of the Specific Plan, Plaintiff has not presented evidence on which a reasonable jury could find for the Plaintiff. *Kawaoka*, 17 F.3d at 1239. Furthermore, the City's decision to delay implementation of the Specific Plan is dissimilar to the situation in *Tovar v. Billmeyer*, 721 F.2d 1260 (9th Cir. 1983), *cert. denied*, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 152 (1984), where the city denied the plaintiff's application for a build-

ing permit. There, deposition testimony indicated that a Council meeting had been called specifically to find a way to rid the city of the plaintiff's adult theater, and that the Council instructed the inspector to deny plaintiff's building permit. Thus, the Court denied summary judgment. However, the city in *Tovar* affirmatively acted to deny plaintiff his First Amendment rights and admitted that it would normally be improper for the Council to instruct the inspector to deny a building permit. In addition, the plaintiff raised a genuine issue of fact with deposition testimony that indicated the *sole* reason for his permit denial was to prevent protected activity.

In contrast, the Plaintiff in the instant case has not shown through deposition testimony that the only reason the City did not implement the Specific Plan was to prevent its First Amendment activity. Furthermore, the City's decision regarding the Specific Plan was not specific to Plaintiff, as it would be in an application for a building permit. The Specific Plan will affect an entire community, while the denial of a building permit specifically impacts the applicant alone. Finally, Plaintiff has not produced any evidence indicating that it has applied to the City to amend the General Plan and been turned down based on the City's desire to suppress Plaintiff's First Amendment activities. Therefore, based on the deposition testimony provided by Plaintiff, a reasonable jury could not find that the City delayed the implementation of the Specific Plan solely to thwart Plaintiff's desire to open a topless bar.

### 3. Adequacy of alternative locations for adult businesses in the city

#### a. Number of sites available

##### (1) Standard to determine available sites

Plaintiff asserts that the City's adult business zoning scheme is unconstitutional be-

---

8. Furthermore, the fact that this litigation may have had something to do with stopping the EIR process does not in turn mean that it had *everything* to do with the stoppage.

9. Plaintiff states that "City witnesses at depositions ... indicated that as far as they knew it was this lawsuit that stopped the process and nothing

else." Pl. Stmt. Gen. Issues at ¶ 43. However, Plaintiff's proffered deposition testimony actually contradicts this statement. This lawsuit was not the only factor that stopped the approval process of the Specific Plan, but one of a "variety of reasons."

cause it "allows too few legally permissible locations for adult entertainment businesses," in violation of the requirements set forth in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102 (9th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989); and *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524 (9th Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). FAC at 32:3–7. Plaintiff contends that there is a "genuine factual dispute regarding the extent of the properties available and the nature of the properties." Pl. Opp. at 14:10–12.

■ The Supreme Court has held that while a city may regulate adult businesses by "dispersing them ... or by effectively concentrating them," such regulations must "refrain from effectively denying ... a reasonable opportunity to open and operate an adult [business] within the city." *Renton,* 475 U.S. at 54, 106 S.Ct. at 932. The Supreme Court has never provided a bright line rule for determining whether a zoning ordinance "allows for reasonable alternative avenues of communication." *Id.* at 53, 106 S.Ct. at 932. However, the Supreme Court and the Ninth Circuit have clearly held that adult businesses "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees." *Id.* at 54, 106 S.Ct. at 932. Thus, "the possible economic impact upon a business is not a factor to be considered by the courts when determining whether a city has provided a business with a reasonable alternate location." *Topanga Press,* 989 F.2d at 1529. As a result, the court is not to "inquir[e] into whether a relocation site is " 'commercially viable' " or only " 'potentially' " as opposed to " 'actually' " available." *Id.* (quoting *Renton,* 475 U.S. at 53, 106 S.Ct. at 932).

Instead, the court is first to consider "whether relocation sites provided to a business may be considered part of an actual business real estate market,"[10] and then whether, "after excluding those sites that may not properly be considered to be part of the relevant real estate market, there are an adequate number of potential relocation sites for already existing businesses." *Id.* at 1530. The Ninth Circuit has articulated factors that the court must analyze to determine whether a particular relocation site is part of the relevant real estate market as follows:

(1) First, although *Renton* stresses that the First Amendment only requires a relocation site to be *potentially* available rather than actually available, the requirement of potentiality connotes genuine possibility ... we need determine only that property is not "potentially" available when it is unreasonable to believe that it would ever become available to any commercial enterprise.

(2) Second, ... relocation sites which are within manufacturing or industrial zones ... that are reasonably accessible to the general public may also be part of the market.

(3) Third, areas in manufacturing zones which have proper infra–structure ... may be included in the market.

(4) Fourth, when a relocation site suits some generic commercial enterprise, although not every particular enterprise, it too may be said to be part of the real estate market....

(5) Fifth, and most obvious, those relocation sites which are commercially zoned are part of the market.

*Topanga Press,* 989 F.2d at 1531.[11]

### (2) Analysis

The City contends that its adult use regulations, permitting adult businesses only in

---

**10.** The Ninth Circuit also held that a court can "consider economics when evaluating whether a particular relocation site is in fact part of the real estate market." *Topanga Press,* 989 F.2d at 1530.

**11.** The court further emphasized that once a relocation site is assumed to be part.of the mar-

ket "it is not relevant whether a relocation site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business. The issue is whether any site is part of an actual market for commercial enterprises generally." *Topanga Press,* 989 F.2d at 1531.

the CG zoning district [12] are constitutionally sound because there are an adequate number of potentially available alternative sites to sustain Plaintiff's business as well as other adult businesses that might locate in the City. City Mot. at 2:8–16. The City maintains that there are at least 25 potential alternative sites, based on a study performed by James, in which his staff randomly mapped out sites in the CG zone meeting the 1,000 foot distance requirement from existing adult businesses by "drawing a 1,000 [foot] radius circle around each assumed site ... to simulate the effect of the 1,000 foot separation provision of the City's adult use regulation." James Decl. at ¶ 6. However, because the City has not provided this Court with the location of the assumed sites, and the Plaintiff's designated expert from the November 17, 1995 hearing disputes this number, the Court will not consider the City's method of determining the number of potentially available sites in its analysis.

Because Plaintiff's expert, Robert B. Lamishaw, has performed a similar mapping analysis and provided the Court with not only detailed evidence of his methodology, but also the location of the sites identified, the Court will determine whether the City has left adequate alternatives for First Amendment expression based on Plaintiff's expert's findings. After performing a zoning analysis and survey, which included a field study, Lamishaw concluded that there are between 11 to 16 "theoretically possible 'sites' for adult uses in the City of Pasadena." Third Lamishaw Decl. at ¶ 4. The minimum and maximum numbers depend on where the first adult business locates considering the 1,000 foot separation requirement. *Id.* Furthermore, to determine the number of potentially available sites for adult businesses in the City's CG zone, Lamishaw considered the following factors:

(A) the proximity exclusions from "sensitive uses" mandated by subsection "H" of the Additional Use Regulations of § 17.28.020 [500 foot distance requirement];

(B) the requirement of § 17.64.120 ... that no such use can be made of any buildings the entrances or exits of which face a residential use;

(C) the Lincoln Corridor exclusion of all CG–1 District property located as required by subsection H of the Additional Use Regulations of § 17.28.020;

(D) the exclusion of all property that possessed any of the disqualifying characteristics discussed in the case of *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524 (9th Cir.1993), and which justified the conclusion that the property could properly be excluded from the relevant real estate market.

First Lamishaw Decl. at ¶ 14.

Thus, Lamishaw performed four levels of exclusions to determine that between 11 and 16 sites were potentially available for adult use in the City.

It appears that Plaintiff is now attempting to distance itself from its own expert's figure, stating, "[t]he qualification, 'theoretically,' is not the equivalent of 'simultaneously' operating .... the hearing on preliminary injunction only dealt with theoretical areas—that is, areas that were available from an examination of a zoning map, not an examination of individual parcels to see what was actually on them. To see what is actually located on the parcels, please review the Kaltenthaler declaration...." Pl. Stmt. Gen. Issues at ¶ 25.[13] Yet, Lamishaw's declaration reveals that his determination was in fact made by examining

---

**12.** In addition to the CG zoning district requirement, the City's municipal code also provides that "the exterior walls of a new adult business shall be at least 500 feet from the boundaries of a site occupied by a religious assembly, public or private school, general day care, or park and recreation facility use [also known as sensitive uses] which existed prior to establishment of the adult business, and at least 1,000 feet from the exterior walls of another adult business." City

Mot. Ex. 6 at 0012 (Additional Use Regulation H of P.M.C. § 17.28.020).

**13.** The Court notes that Plaintiff has not submitted expert testimony in Opposition to this motion. However, Plaintiff agrees that the Court may consider evidence received at the November 17, 1995 hearing in conjunction with Defendant's motion for summary judgment. *See* Pl. Stmt. Gen. Issues at ¶ 1.

the individual parcels, not by simply looking at a zoning map.[14]

■ While, Lamishaw indicates that he "did not attempt to determine whether any of the 'theoretically permissible' areas which [he] identified contained sites which were actually available, were adequately developed or improved for the intended use, or possessed adequate parking spaces," these factors are irrelevant to the Court's determination of sites available within the relevant real estate market. First Lamishaw Decl. at ¶ 15. *See Renton,* 475 U.S. at 53–54, 106 S.Ct. at 932 (fact that some properties may already be occupied is irrelevant); *Woodall v. City of El Paso,* 49 F.3d 1120, 1124 (5th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 516, 133 L.Ed.2d 425 ("fact that a site may not be commercially desirable does not render it unavailable . . . commercial viability is not a relevant consideration."); *Topanga Press,* 989 F.2d at 1532 (finding that factors such as whether relocation sites were operatively expensive or whether adult businesses are not welcomed by landlords are improper). Thus, the 11 to 16 sites that Lamishaw has pointed to as "theoretically available," are in fact part of the relevant real estate market pursuant to the *Topanga* factors.[15]

The sites are, in fact, "potentially available," as Lamishaw, according to *Topanga's* requirement that the properties be potentially available, excluded "warehouses, sewage treatment plants and swamps . . ., as well as real estate which is the subject of long term commitments and capital–intensive, special–purpose structures." First Lamishaw Decl. at ¶ 32. The second through fourth *Topanga* factors are irrelevant as none of the potential sites are located in an industrial or manufacturing zone. Finally, the potential sites meet the fifth *Topanga* factor, as they are all within the commercial zone.

Furthermore, the Kaltenthaler declaration presents no evidence to rebut the availability of 11 to 16 sites within the relevant real estate market.[16] The Court therefore finds

14. Lamishaw declares that the *"first step"* in his survey was to review the City's zoning and planning maps to identify all of the properties located in the CG zone. First Lamishaw Decl. at ¶ 22. The next step, however, "was to conduct a *field survey* . . . to gather information as to the existence and *precise location* of every 'sensitive use' . . . as well as to determine whether there were *buildings* within those zones with entrances or exits which faced residential zones. . . . Another purpose of the field study was to gather information in order to determine whether under the criteria of the *Topanga Press* case there were any factors present which would *disqualify properties* because they were not part of the relevant commercial real estate market." *Id.* at ¶ 23. (emphasis added).

In fact, Lamishaw directed his staff personally "to determine in the field" if they found any "sensitive uses [and] to note their *precise locations* and report that information back to [him]." *Id.* at ¶ 25. (emphasis added). Lamishaw then measured and excluded all properties "within 500 feet of the boundaries of each of those sites on which a triggering sensitive use was located," as well as excluding any properties "that were identified in the *field survey* as having buildings with an exit or entrance which faced a residential use." *Id.* at ¶ 28, 31 (emphasis added). Finally, and most importantly for this Court's analysis, Lamishaw excluded properties which, "in [his] professional opinion should properly be excluded as part of the relevant real estate market under the criteria set forth in the *Topanga Press* case." *Id.* at ¶ 32. Properties that Lamishaw

excluded based on these factors included governmentally–owned property, a water treatment plant, a car dealership, property occupied by the Jet Propulsion Lab of Cal Tech University, and property occupied by FEDCO. *Id.* Ex. B.

15. These sites are as follows:

| Intersection | Sites |
| --- | --- |
| Orange Grove & Mentor | 1 |
| Sierra Bonita & Walnut | 2 to 3 |
| Walnut & Oak | 1 |
| Colorado & Allen, Colorado & San Marino | 1 or 2 |
| Walnut & Elouise, Colorado & Virginia | 1 or 2 |
| Corson & Altadena, Foothill & Vista, Foothill & Vinedo Foothill from San Gabriel to Sunnyslope | 1 to 3 |
| Colorado & El Nido | 1 |
| Colorado & Northrup, Colorado & Halstead | 1 |
| Foothill & Sierra Madre Villa Ave. | 1 |

Third Lamishaw Decl., Ex. C.

16. The Kaltenthaler declaration includes photographs of "sensitive uses," such as churches, located within the CG zone. However, any sites within 500 feet of these sensitive uses have already been excluded by both Lamishaw and James in their analyses of potential sites. *See* prior discussion in this Order; James Decl. at ¶ 5a(3). Further, the significance of these pictures is not clear to the Court. Some, such as the picture of a Payless Drug store, seem to be offered by Plaintiff to show that the property is currently occupied. Kaltenthaler Decl. at 100. However, as explained above, to be considered in

that there are at least 11 to 16 potential sites within the available real estate market of the City of Pasadena on which adult businesses may simultaneously operate, based on the Lamishaw declarations and Plaintiff's failure to demonstrate otherwise.

### b. Reasonableness of alternative locations

#### (1) Standard to determine reasonableness

■ Once the potentially available properties have been located within the relevant real estate market, there is no bright line rule as to the number of sites or percentage of land area necessary to establish "reasonable alternative avenues of communication," under *Renton*. *See Lakeland Lounge v. City of Jackson*, 973 F.2d 1255, 1260 (5th Cir. 1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 469 (1993) ("there is no requirement in *Renton* ... that a specific proportion of a municipality be open for adult businesses or that a certain number of sites be available."). Thus, to determine whether a City has left reasonable alternative locations for adult businesses, "courts have looked to a variety of relevant factors, including the percentage of land theoretically available to adult businesses, the number of sites potentially available in relation to the population of the city, the number of sites compared with the existing number of adult businesses, or the number of businesses desiring to offer adult entertainment." *3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1257, 1265 (C.D.Cal.1995).

For example, in determining that the city provided reasonable alternatives for adult businesses, the court in *Woodall* compared the number of adult businesses demanding relocation sites with the number of sites po-

tentially available. *Woodall*, 49 F.3d at 1127. The court then reversed the jury's verdict in favor of the adult businesses, finding that "there were at all relevant times more 'reasonable' sites available than businesses with demands for them. The Ordinances therefore afforded the Adult Businesses adequate alternative means of communication." *Id.* Similarly, the court in *International Food & Beverage Systems v. City of Fort Lauderdale*, 794 F.2d 1520, 1526 (11th Cir.1986), found that in determining whether the number of sites available for adult businesses is reasonable, the court should consider "community needs, the incidence of nude bars in other comparable communities, the goals of the city plan, and the kind of city the plan works towards." [17]

#### (2) Analysis

■ The City asserts that, even if the Court accepts Plaintiff's numbers of 11 to 16 potentially available sites (which the Court has), the number of alternative sites is reasonable, given Pasadena's population of 135,000 and "given the fact that historically only one adult use has resided in the City and given that 84% of the City is tied up in residential and public service uses." City. Mot. at 19:27 to 20:2; James Decl. at ¶ 3. The City also contends that the number of potentially available sites is reasonable considering that "no person has filed an application for a permit to open an adult business within the City" since 1985, except for Le Sex Shoppe, an adult bookstore, which existed prior to the City's 1985 adult use zone change. James Decl. at 11–12.

Plaintiff disputes that there have been no other requests to open adult businesses since 1985. However, to rebut James' statement, Plaintiff merely states "[n]umerous persons

the relevant real estate market, the property need only be "potentially" available, not "actually" available. In addition, Kaltenthaler is not an expert, and thus is not qualified to determine what parcels are within the relevant real estate market. Finally, Plaintiff asserts that it has not had an opportunity to evaluate each property, and thus the Kaltenthaler declaration may not be complete. Pl. Opp. at 14:14–18; Diamond Decl. at 3:17–18. However, Plaintiff has had two months in which to move for a continuance pursuant to Federal Rule of Procedure 56(f), but has failed to do so. Plaintiff also has not asked

leave of the Court to submit supplemental declarations or other evidence to refute the number of sites available. In fact, Plaintiff stated that it would "be submitting ... [a] site review of the City's maps," but has not done so to this date. Kaltenthaler Decl. at 17.

17. The court was "at a loss how anyone could determine that as many as 22 sites [10 for already existing businesses and 12 for new businesses in a city of 156,000] for such [adult businesses] were not enough, without reference" to the above. *International Food*, 794 F.2d at 1526.

are actively combing southern California to find areas for adult uses. See Kaltenthaler declaration." Pl. Stmt. Gen. Issues at ¶ 10. But the Kaltenthaler declaration does not provide any specific facts or instances of other adult businesses attempting to locate in Pasadena. In fact, Plaintiff fails to provide any evidence to rebut the City's contention that 11 to 16 sites are sufficient for a city of 135,000 with one existing adult business. City Mot. at 20:7–8.

Instead, Plaintiff maintains that "[t]here is a genuine factual dispute regarding the extent of the properties available and the nature of the properties." Pl. Opp. at 14:9–12. However, as stated above, Plaintiff fails to point out how its own expert's delineation of 11 to 16 sites did not evaluate the extent or nature of the properties. Furthermore, Plaintiff seems to rest its rebuttal of the City's evidence that the number of sites are reasonable on this Court's prior Order denying Plaintiff's preliminary injunction, at which time the Court stated that "serious issues going to the merits create fair grounds for litigation in this case." *3570 East Foothill Blvd., Inc.*, 912 F.Supp. at 1266. However, in opposing a summary judgment motion, Plaintiff cannot rest upon "mere allegations or denials." Plaintiff must set forth specific facts such that a reasonable jury could find in its favor. Here, Plaintiff has failed to

raise any issue as to why the 11 to 16 sites specifically mapped out by its own expert do not reasonably allow adult businesses to locate in the City of Pasadena. In short, Plaintiff has failed to rebut any of the City's evidence regarding the reasonableness of 11 to 16 sites.

While Plaintiff has failed to contradict the City's evidence of "reasonableness" in order to raise a genuine issue of material fact, the Court has nevertheless made its own determination as to the reasonableness of the potentially 11 to 16 sites available for adult businesses. As the City's Planning Director, Mr. James, has declared, the City of Pasadena has a population of 135,000, with over 84% of its land designated as residential, public/semi–public or open space zones. James Decl. at ¶ 3. Furthermore, only one adult business is presently located in the City, unaffected by the City's zoning ordinances, and Plaintiff is currently the only adult business demanding a location within the City. *Id.* at ¶¶ 11–12. As stated above, Plaintiff has not disputed these facts. The City's community need for adult businesses, thus, appears to be small, considering that Plaintiff is the only person or corporation to have applied to open an adult business in over ten years.[18] In addition, the City's zoning ordinance does not affect existing adult

---

18. Plaintiff contends that the "City prior to their adult ordinance was home to a number of thriving adult business which at least by the few newspaper clippings ... indicate that they were well received by quite a few Pasadena residents." Kaltenthaler Decl. at ¶ 18, Ex. O (containing two newspaper clippings from the 1960's discussing the City's attempt to require permits for the adult businesses located in Pasadena and one clipping from 1988 discussing the City's decision not to rent the Rose Bowl to a beauty contest that the City considered to be "an affront to the strides Pasadena has made toward the advancement of the rights of women."). While Pasadena may have been home to more adult businesses prior to the City's adult ordinances, the Supreme Court has held that zoning ordinances restricting the presence of adult businesses without entirely banning them are "time, place, and manner regulations [that] are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 47, 106 S.Ct. at 928. *See also Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70–71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976).

Therefore, the question before this Court is whether the City's adult zoning regulations "refrain from effectively denying [Plaintiff] a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 54, 106 S.Ct. at 932; *Topanga Press*, 989 F.2d at 1529 (quoting above language from *Renton* as "test for determining whether the Adult Businesses' First Amendment rights are threatened."). However, the Court need not consider the City's makeup during the 1960's. The relevant issue is whether the zoning ordinance enacted by the City to regulate adult businesses leaves current and future adult businesses with sufficient opportunities to open and operate in the City. *See Lakeland Lounge*, 973 F.2d at 1260 (determining reasonableness of sites based on existing adult businesses); *Alexander v. City of Minneapolis*, 928 F.2d 278 (8th Cir.1991) (determining 6.6% of land area or 120 sites were reasonable for owners of adult theaters to locate their businesses); *BBI Enterprises, Inc. v. City of Chicago*, 874 F.Supp. 890 (N.D.Ill.1995) ("concept of 'reasonable opportunity' must relate to the *prospective* producers of adult use goods and services")(emphasis added).

use establishments, as Plaintiff's current business is not considered an adult use and Le Sex Shoppe, the only present adult business in the City, is not required to relocate. Thus, the City's ordinance is different from those invalidated because they fail to provide a reasonable opportunity for adult businesses to operate. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 n. 35, 96 S.Ct. 2440, 2453 n. 35, 49 L.Ed.2d 310 (1976) (upholding adult business zoning ordinances in part because the district court found that "[t]he Ordinances do not affect the operation of existing establishments but only the location of new ones.' "); *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1109–10 (9th Cir.1988) (holding that ordinance concentrating adult businesses in one area with 1,000 foot separation requirement violated First Amendment because ordinance would "force the only existing adult theater in [the city] to close at its present location with no definite prospect of a place to relocate."); *Alexander v. City of Minneapolis*, 698 F.2d 936, 938 (8th Cir.1983) (finding adult business zoning ordinance with 500 foot separation requirement violated the First Amendment because it "not only regulates new adult facilities but also affects those in existence at the time it was enacted.... There are at most twelve possible legal sites for relocation ... [such that the ordinance] 'would have the effect of substantially reducing the number of adult [businesses] ...' and 'no new adult [businesses] would be able to open.' ").

In addition, while Plaintiff's expert, Lamishaw, found that between .95% and .73% of the City's land area is "theoretically permissible for locations for adult uses,"[19] the courts have not established a bright line rule as to the percentage of land or number of sites that a city must make available for adult businesses. *See Lakeland Lounge*, 973 F.2d at 1260 ("there is no requirement in *Renton, Woodall*, or elsewhere that a specific proportion of a municipality be open for adult businesses or that a certain number of sites be available."). Considering that all of the potential sites for adult businesses are located in the CG zoning district and meet the City's other restrictions,[20] the City's adult use ordinance leaves a reasonable opportunity for adult businesses to locate within the City. The City's ordinance does not require any existing adult business to shut down as in *Walnut Properties*, and between 11 and 16 new adult businesses will be able to operate simultaneously in a commercially zoned area. Providing locations for even 11 new adult businesses is adequate, given that currently only one adult business is located in Pasadena,[21] a city with 84% of its land area dedicated to residential and public use. Plaintiff has the burden of setting forth specific facts showing a genuine issue as to whether the sites open to it provided reasonable alternative avenues of communication.[22] Plaintiff has failed to do so.

### III. Conclusion

For all of the reasons set forth above, the Court hereby ORDERS that Defendant's motion for summary judgment is GRANTED.

**SO ORDERED.**

---

19. *See* Second Lamishaw Decl. at ¶ 17. In his Third declaration Lamishaw determined that this area of land translated into 11 to 16 "theoretically possible 'sites' for adult uses in the City of Pasadena." Third Lamishaw Decl. at ¶ 4. Furthermore, Lamishaw's determination of the actual sites potentially available is more probative, considering the 1,000 foot separation requirement. *See Walnut Properties, Inc.*, 861 F.2d at 1108 ("The number of sites available to adult businesses under the ordinance, therefore, depends not so much on the total amount of acreage available under the zoning scheme, but on how that acreage is dispersed throughout the City.").

20. The 1,000 foot separation requirement from other adult businesses, the 500 foot separation requirement from "sensitive uses," and the requirement that an adult entertainment establishment's entrance or exit not face a residential use.

21. Thus, the City is not faced with the situation in *Topanga Press*, where at least 102 adult businesses would be required to locate to at most 120 sites, including sites located in the manufacturing zone and lacking the proper infra–structure. *Topanga Press*, 989 F.2d at 1532–33.

22. *See Woodall*, 49 F.3d at 1126 ("Adult Businesses had to show that the areas left open to them were inadequate to satisfy the demand for adult business locations").